IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
Seattle Division

| | | |
|---|---|---|
| CHERYL ENSTAD;<br><br>PAXTON ENSTAD, by and through his next friend and mother, CHERYL ENSTAD,<br><br>*Plaintiffs*,<br><br>v.<br><br>PEACEHEALTH, a Washington nonprofit corporation,<br><br>*Defendant*. | ) | No. ___________________<br><br>**COMPLAINT** |



AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

**COMPLAINT**

1. This is a civil rights complaint brought by Paxton Enstad and his mother for sex discrimination in violation of "Section 1557", The Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 (2012) ("Section 1557"), and sex and gender identity discrimination in violation of the Washington Law Against Discrimination ("WLAD"), WASH. REV. CODE § 49.60 *et seq*.

2. PeaceHealth is a Catholic healthcare organization that operates 70 sites in Washington, Oregon, and Alaska and has approximately 16,000 employees. It provides health benefits to its employees through a self-funded plan, the PeaceHealth Medical Benefits Plan (the "Plan" or "PeaceHealth's Plan").

3. For more than twenty years, Plaintiff Cheryl Enstad was employed as a medical social worker at PeaceHealth St. Joseph Medical Center. Ms. Enstad and her family—including her teenage son, Paxton ("Pax")—rely on PeaceHealth and its Plan to provide them with coverage for medically necessary healthcare.

4. Pax is a boy who is transgender, which means that he has a male gender identity even though the sex assigned to him at birth was female.[1] He was diagnosed with gender dysphoria, which is a serious medical condition that is codified in the Diagnostic

[1] Individuals are usually assigned a sex at birth based on an examination of external anatomy. "Biological sex" is an inaccurate description of the sex given to a person at birth because there are many biological components of sex including chromosomal, anatomical, hormonal, and reproductive elements, some of which could be ambiguous or in conflict within an individual. In addition, research indicates that gender identity has a biological component. A person's gender identity, meaning the innate sense of being male, female, both, or neither, is the most important determinant of a person's sex.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-10). The condition of gender dysphoria is marked by persistent and clinically significant distress caused by incongruence between an individual's gender identity and that individual's sex designated at birth.

5. If left untreated, gender dysphoria can lead to debilitating anxiety, depression, self-harm, and even suicide. When gender dysphoria is properly treated, transgender individuals experience profound relief and can go on to lead healthy, happy, and successful lives.

6. In the past, some public and private insurance companies excluded coverage for gender dysphoria (or "transition-related care") based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, every major medical organization recognizes that such exclusions have no basis in medical science and that transition-related care is effective, safe, and medically necessary when clinically indicated for treatment of gender dysphoria.

7. Before Pax began receiving medically necessary treatment, he suffered debilitating depression and anxiety as a result of his untreated gender dysphoria. His grades at school fell; he was unable to participate in activities such as swimming and athletics; he wore several layers of clothing to hide his chest from view; and he eventually avoided going outside altogether.

8. Pax also began wearing a chest binder to flatten his chest nearly twenty-four hours per day. Although wearing a chest binder for more than ten hours can restrict a person's breathing and cause long-term medical consequences, Pax's gender dysphoria



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

became so severe that he had tremendous difficulty wearing a chest binder less than twenty-four hours a day without experiencing debilitating anxiety, extreme distress, and significantly disrupted sleep and the associated decrease in functioning.

9. In accordance with widely accepted standards of care, Pax's doctors prescribed testosterone hormone therapy and chest reconstruction surgery to bring his body into greater alignment with his gender identity and alleviate the clinically significant distress.

10. When Pax's doctor submitted a preauthorization request for Pax's surgery, the Plan's administrator denied authorization, stating that PeaceHealth does not cover any "transgender services" in its health-benefits plan.

11. The Plan singles out transgender beneficiaries for unequal treatment by categorically depriving them of all medical care for gender dysphoria, regardless of whether those treatments are medically necessary.

12. Cheryl was stunned to learn about the exclusion. When she discovered that PeaceHealth would not cover "transgender services," Cheryl felt that she was being told by PeaceHealth that her son was undeserving of medical care to which he would otherwise be entitled, simply because he is transgender.

13. As a result of the exclusion for "transgender services," Cheryl and her husband were forced to pay over $10,000 for the medically necessary care that Pax needed. In order to do so, she has had to use some of Pax's college savings funds and take out a second mortgage on her house.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

14. PeaceHealth's blanket policy of denying insurance coverage for "transgender services," regardless of whether those treatments are medically necessary, is discriminatory and harmful to the health of transgender individuals. Cheryl and Pax bring this action against PeaceHealth seeking declaratory relief and damages caused by the discriminatory denial of medically necessary care for "transgender services."

**JURISDICTION**

15. This action arises under the Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 ("Section 1557"), and the Washington Law Against Discrimination ("WLAD"), WASH. REV. CODE § 49.60 *et seq.*

16. This Court has jurisdiction over the Section 1557 claim pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343. This Court has supplemental jurisdiction over the WLAD claim pursuant to 28 U.S.C. § 1367.

17. Declaratory relief is authorized by 28 U.S.C. §§ 2201—2202.

18. This Court has personal jurisdiction over Defendant because Defendant's corporate headquarters is located in this District.

**VENUE**

19. Venue lies with this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

20. Venue also lies with this Court pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiffs reside in this District, Ms. Enstad works in this District, and Defendant's decisions regarding the design of the Plan are made in this District.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

21. Venue lies with the Seattle Division pursuant to Local Rules W.D. Wash. LCR 3(e) because a substantial part of the events or omissions giving rise to the claims occurred in Whatcom County, where Plaintiff works and thereby where Defendant provided her with the employment benefits at issue.

**PARTIES**

22. Plaintiff Cheryl Enstad resides in Bellingham, Washington.

23. Plaintiff Paxton Enstad resides in Bellingham, Washington.

24. PeaceHealth is a non-profit corporation organized under the laws of Washington. Its corporate headquarters is located in Vancouver, Washington. PeaceHealth St. Joseph Medical Center is located in Bellingham, Washington.

25. PeaceHealth is a healthcare organization with approximately 16,000 employees. It operates 70 sites in Washington, Oregon, and Alaska.

**FACTUAL ALLEGATIONS**

26. "Gender identity" is a well-established medical concept, referring to one's sense of oneself as belonging to a particular gender. Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. For transgender individuals, however, the sense of one's self—one's gender identity—differs from the sex assigned to them at birth.

27. Transgender men are men who were assigned "female" at birth, but have a male gender identity. Transgender women are women who were assigned "male" at birth, but have a female gender identity.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

28. The medical diagnosis for the feeling of incongruence between one's gender identity and one's sex assigned at birth, and the resulting distress caused by that incongruence, is "gender dysphoria" (previously known as "gender identity disorder"). Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-10). The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).

29. The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by the leading medical organizations, including the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics.

30. Under the WPATH standards, medically necessary treatment for gender dysphoria may require medical steps to affirm one's gender identity and transition from living as one gender to another. This treatment, often referred to as transition-related care, may include hormone therapy, surgery (sometimes called "transition-related surgery," "sex reassignment surgery," or "gender confirmation surgery"), and other medical services that align individuals' bodies with their gender identities. The exact medical treatment varies based on the individualized needs of the person.

31. According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

32. In the past, public and private insurance companies excluded coverage for transition-related care based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, the medical consensus is that exclusions of transition-related healthcare have no basis in medical science.

33. For example, in 2008 the American Medical Association ("AMA") passed Resolution 122 recognizing gender dysphoria (then known as Gender Identity Disorder, or GID) as a "serious medical condition" which, "if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression and, for some people without access to appropriate medical care and treatment, suicidality and death." American Med. Ass'n, *Resolution 122: Removing Financial Barriers to Care for Transgender Patients* (June 16, 2008). The AMA emphatically asserts that "[h]ealth experts in GID, including [WPATH], have rejected the myth that such treatments are 'cosmetic' or 'experimental' and have recognized that these treatments can provide safe and effective treatment for a serious health condition." *Id.*

34. In Resolution 122, the AMA also opposes categorical exclusions of coverage for treatment of gender dysphoria when prescribed by a physician, noting that "many of these same treatments … are often covered for other medical conditions" and that "the denial of these otherwise covered benefits for patients suffering from GID represents discrimination based solely on a patient's gender identity." *Id.*

35. The American Psychiatric Association, the American Psychological Association, and the American Academy of Pediatrics have all issued similar resolutions.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

36. According to federal courts, categorical exclusions of transition-related healthcare are so far outside the bounds of accepted medical practice that they constitute deliberate indifference to a serious medical need when used as a justification for denying healthcare to prisoners.

**The Plan's Categorical Exclusion of Coverage**

37. From 1996 to April 7, 2017, Plaintiff Cheryl Enstad was employed as a medical social worker at PeaceHealth St. Joseph Medical Center (the "medical center"), which is owned and operated by PeaceHealth. From 2009 to 2017, she worked at the medical center's hospice program, Whatcom Hospice.

38. As a medical social worker, Ms. Enstad's job duties were non-ministerial. She did not conduct worship services, religious ceremonies, or rituals for PeaceHealth, and she did not serve as a messenger or teacher of its faith.

39. PeaceHealth provides healthcare coverage to employees and their dependents, including Ms. Enstad and her son, Pax, through the Plan. (Ex. A).

40. The Plan is a self-funded "church plan" that is not administered in accordance with the Employee Retirement Income Security Act, 29 U.S.C § 1001, *et seq.*

41. The Plan has a general exclusion for procedures that are "not medically necessary." (Ex. A at 121).

42. In addition to that generally applicable exclusion, the Plan categorically excludes coverage "for gender change or for procedures to change one's physical characteristics to those of the opposite gender," and coverage for "services, supplies and medications related to preparation for sex change operations and medical or



AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

psychological counseling or hormonal therapy in preparation for, or subsequent to, any such procedure." (Ex. A at 119, 122). The only function of these categorical exclusions is to exclude coverage for medically necessary transition-related care that would otherwise have been covered.

43. In contrast, the Plan provides coverage for many of the same procedures, such as medically necessary hysterectomies and mastectomies, when they are used to treat medical conditions other than gender dysphoria.

44. During 2016, the Plan was administered by Healthcare Management Administrators, Inc. ("HMA"), which is a fully owned subsidiary of Regence Insurance.

45. Regence Insurance has adopted a "Medical Policy Manual," which provides for coverage of medically necessary treatments for gender dysphoria in accordance with the WPATH Standards of Care, including, *inter alia*, continuous hormone therapy, hysterectomy, mastectomy (subcutaneous mastectomy or simple/total mastectomy, which may include related nipple/areola reconstruction), metoidioplasty, nipple/areola reconstruction related to subcutaneous or simple/total mastectomy with nipple/areola excision or repositioning, penile prostheses implantation, phallic reconstruction/phalloplasty, salpingo-oophorectomy, scrotoplasty, testicular prostheses implantation, urethroplasty, vaginectomy. (Ex. B at 5).

46. PeaceHealth's Plan does not follow the Regence Medical Policy Manual. Although HMA has concluded that these forms of transition-related care can be medically necessary treatments for gender dysphoria, PeaceHealth has prohibited HMA



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

from paying for these medically necessary procedures when acting as a third-party administrator for PeaceHealth's Plan.

47. On or around January 1, 2017, PeaceHealth switched its plan administrator to Meritain Health, a subsidiary of Aetna Inc. ("Aetna").

48. Aetna has adopted Policy 0615, which provides for coverage of medically necessary treatments for gender dysphoria, including, *inter alia*, mastectomy, gonadectomy (i.e. hysterectomy and oophorectomy in female-to-male and orchiectomy in male-to-female patients), genital reconstructive surgery, gonadotropin-releasing hormone treatment, urethroplasty, testicular prostheses implantation, scrotoplasty, vulvectomy, vaginoplasty. (Ex. C at 1, 10).

49. PeaceHealth's Plan does not follow Policy 0615. Although Aetna has concluded that these forms of transition-related care can be medically necessary treatments for gender dysphoria, PeaceHealth has prohibited Aetna from paying for these medically necessary procedures when acting as a third-party administrator for PeaceHealth's Plan.

**Denial of Medically Necessary Care**

50. Pax is a boy who is transgender, which means that he has a male gender identity even though he was designated female at birth.

51. When he was eleven years old and started going through puberty, Pax began to suffer from debilitating depression and anxiety as a result of gender dysphoria. His grades at school fell. He received research-based treatment for depression and anxiety without symptom relief, and his symptoms worsened without specific treatment



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

for gender dysphoria. He became unable to participate in activities such as swimming and athletics; he wore several layers of clothing to hide his chest from view; and he eventually avoided going outside altogether.

52. Pax also began wearing a chest binder to flatten his chest nearly twenty-four hours per day. Although wearing a chest binder for more than ten hours can restrict a person's breathing and cause long-term medical consequences, Pax's gender dysphoria became so severe that he had tremendous difficulty wearing a chest binder less than twenty-four hours a day without experiencing debilitating anxiety, extreme distress, and significantly disrupted sleep and the associated decrease in functioning.

53. In 2016, when Pax turned 16 years old, his medical providers prescribed chest-reconstruction surgery as treatment for gender dysphoria. In accordance with the WPATH standards for treating gender dysphoria, Pax's medical providers concluded that surgery was medically necessary to treat his severe gender dysphoria and its negative effect on his life functioning, including sleep, recreation, and emotional well-being.

54. Pax's chest-reconstruction surgery would have been covered as medically necessary treatment for gender dysphoria under both Regence's Medical Policy Manual and Aetna Policy 0615.

55. On September 6, 2016, Pax's surgeon requested preauthorization for the Plan to cover his medically necessary chest reconstruction surgery.

56. The next day, HMA denied preauthorization with the following message: "This member has no coverage for any transgender services under their health plan. Thank you."



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

57. As required by PeaceHealth's Plan, HMA denied coverage for the chest reconstruction surgery without making any determination of whether the surgery was medically necessary.

58. Pax underwent a medically necessary chest-reconstruction surgery on September 20, 2016. The second after waking up from surgery, Pax felt enormous relief. The surgery has positively affected all aspects of his life by alleviating the debilitating dysphoria he had been experiencing.

59. Immediately after surgery, Pax's parents also observed an immediate change in Pax's health, confidence, and emotional wellbeing. Before surgery, Pax always wore layers of clothes and hunched over to hide his chest. Since undergoing chest reconstruction surgery, Pax walks with his head up and his shoulders back; he can go outside without anxiety; and he has begun swimming again for the first time in years.

60. In order to pay for Pax's medically necessary care, Cheryl was forced to obtain loans against the family home and dip into savings designated as Pax's college fund. Cheryl paid over $10,000 for Pax's surgery and related costs.

**COUNT ONE**

**Violation of ACA § 1557**

(Of behalf of Cheryl Enstad and Pax Enstad)

61. Section 1557 of The Patient Protection and Affordable Care Act § 1557, 42 U.S.C. § 18116 ("Section 1557"), provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*)"—which prohibits discrimination "on the basis of sex"—"be excluded from



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."

62. PeaceHealth receives federal financial assistance, and is therefore a "covered entity" for purposes of Section 1557.

63. On May 13, 2017, the U.S. Department of Health and Human Services issued a final rule (the "Final Rule"). *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376 (May 18, 2016) (to be codified at 45 C.F.R. pt. 92).

64. The Final Rule states that "[a] covered entity that provides an employee health benefit program to its employees and/or their dependents shall be liable for violations of [Section 1557] in that employee health benefit program" if "[t]he entity is principally engaged in providing or administering health services." 45 C.F.R. § 92.208(a).

65. Because PeaceHealth is principally engaged in the business of providing health services, Section 1557 and 45 C.F.R. § 92.208(a) prohibit PeaceHealth from discriminating against employees on the basis of sex in the terms of its employer-sponsored healthcare plan.

66. Discrimination on the basis of transgender status or gender nonconformity is discrimination on the basis of "sex" under Section 1557.

67. By categorically excluding all medically necessary "transgender services" or services related to "gender change" the Plan has drawn a classification that discriminates based on transgender status and gender nonconformity.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

68. As a result of the exclusion in the Plan, non-transgender beneficiaries receive coverage for all of their medically necessary healthcare, but transgender beneficiaries do not.

69. Because medical transition from one sex to another inherently violates gender stereotypes, denying medically necessary coverage for such healthcare constitutes impermissible discrimination based on gender nonconformity.

70. PeaceHealth's exclusion of medically necessary care for gender dysphoria is not based on standards of medical care; it is based on moral disapproval of, and discomfort with, transgender people and gender transition.

71. By excluding all healthcare related to "transgender services" from the only available health plan it provides to employees, PeaceHealth has unlawfully discriminated—and continues to unlawfully discriminate— on the basis of sex in violation of Section 1557.

**COUNT TWO**

**Violation of Washington Law Against Discrimination**

(On behalf of Cheryl Enstad)

72. The Washington Law Against Discrimination ("WLAD"), WASH. REV. CODE § 49.60 *et seq.*, prohibits discrimination on the basis of sex and sexual orientation, which includes gender and gender identity as part of the statutory definition. WASH. REV. CODE § 49.60.040(25)-(26).

73. The WLAD's protections from discrimination are non-exclusive. WASH. REV. CODE § 49.60.030.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

74. The WLAD establishes a clear public policy against discrimination. WASH. REV. CODE § 49.60.010.

75. The WLAD is to be construed liberally. WASH. REV. CODE § 49.60.020.

76. Ms. Enstad's job duties are non-ministerial, and PeaceHealth employs eight or more persons, and is an employer subject to the WLAD. WASH. REV. CODE § 49.60.040(11).

77. The WLAD declares it to be unlawful for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of" sex or gender identity. WASH. REV. CODE § 49.60.180(3).

78. The Plan is a form of compensation in that it is a benefit extended by PeaceHealth to its employees and their beneficiaries as a term of employment.

79. As a result of the exclusion in the Plan, non-transgender beneficiaries receive coverage for all of their medically necessary healthcare, but transgender beneficiaries do not.

80. By categorically excluding all medically necessary "transgender services" or services related to "gender change" the Plan discriminates based on sex and gender identity as defined by the WLAD.

81. Because medical transition from one sex to another inherently violates gender stereotypes, denying medically necessary coverage for such healthcare constitutes impermissible discrimination based on gender nonconformity.



AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

82. PeaceHealth's exclusion of medically necessary care for gender dysphoria is not based on standards of medical care; it is based on moral disapproval of, and discomfort with, transgender people and gender transition.

83. The Washington State's Office of the Insurance Commissioner, which administers a provision of WLAD prohibiting insurance companies from issuing or selling health insurance policies that discriminate on the basis of sex or gender identity, has already concluded that categorical exclusions of coverage for transition related care violate the WLAD. *See* Letter from Mike Kreidler, Ins. Comm'r, Wash. Office of Ins. Comm'rs, to Wash. State Health Ins. Carriers (June 25, 2014), *available at* https://www.insurance.wa.gov/sites/default/files/documents/gender-identity-discrimination-letter.pdf.

84. By excluding all healthcare related to "transgender services" from the health plan it provides to employees, PeaceHealth has unlawfully discriminated against—and continues to unlawfully discriminate against— Ms. Enstad on the basis of sex and gender identity in violation of the WLAD.

**COUNT THREE**

**Violation of Washington Law Against Discrimination**

(On behalf of Pax Enstad)

85. The WLAD prohibits discrimination on the basis of sex and sexual orientation, which includes gender and gender identity as part of the statutory definition. WASH. REV. CODE § 49.60.040(25)-(26).



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

86. The WLAD's protections from discrimination are non-exclusive. WASH. REV. CODE § 49.60.030.

87. The WLAD establishes a clear public policy against discrimination. WASH. REV. CODE § 49.60.010.

88. The WLAD is to be construed liberally. WASH. REV. CODE § 49.60.020.

89. The WLAD's protections are not limited to employees and extend to any discrimination on the basis of sex or gender identity, including in the making or performance of a contract. *Marquis v. City of Spokane*, 130 Wn. 2d 97, 112-13 (Wash. 1996).

90. As a beneficiary under the Plan, Pax is protected by the WLAD from discrimination on the basis of sex and gender identity in PeaceHealth's provision or administration of health insurance benefits, and/or in PeaceHealth's making or performance of a contract for health care.

91. As a result of the exclusion in the Plan, non-transgender beneficiaries receive coverage for all of their medically necessary healthcare, but transgender beneficiaries do not, by virtue of no other characteristic than their sex and gender identity as defined by the WLAD.

92. Because medical transition from one sex to another inherently violates gender stereotypes, denying medically necessary coverage for such healthcare constitutes impermissible discrimination based on gender nonconformity.



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

93. PeaceHealth's exclusion of medically necessary care for gender dysphoria is not based on standards of medical care; it is based on moral disapproval of, and discomfort with, transgender people and gender transition.

94. As beneficiaries and enrollees under the Plan issued by Defendant, Ms. Enstad and Pax are entitled to the full benefit of coverage contained in the Plan, consistent with all relevant legal requirements, including but not limited to the WLAD, and without regard to membership in a protected class.

95. The Washington State's Office of the Insurance Commissioner, which administers a provision of WLAD prohibiting insurance companies from issuing or selling health insurance policies that discriminate on the basis of sex or gender identity, has already concluded that categorical exclusions of coverage for transition related care violate the WLAD. *See* Letter from Mike Kreidler, Ins. Comm'r, Wash. Office of Ins. Comm'rs, to Wash. State Health Ins. Carriers (June 25, 2014), *available at* https://www.insurance.wa.gov/sites/default/files/documents/gender-identity-discrimination-letter.pdf.

96. By excluding all healthcare related to "transgender services," PeaceHealth has unlawfully discriminated—and continues to unlawfully discriminate— against Pax on the basis of sex and gender identity in violation of the WLAD.

**REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:



AMERICAN CIVIL LIBERTIES
UNION OF WASHINGTON
FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184

A. Declaratory relief, including but not limited to a declaration that Defendant violated Section 1557 and the WLAD;

B. Compensatory and consequential damages in an amount to be determined at trial;

C. Pre-judgment and post-judgment interest at the highest lawful rate;

D. Plaintiffs' reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988, WASH. REV. CODE § 49.60.030(3), and WASH. REV. CODE § 49.48.030; and

E. Such other relief as the Court deems just and proper.

Dated: October 5, 2017

/s/*Lisa Nowlin*

Lisa Nowlin, WSBA No. 51512
AMERICAN CIVIL LIBERTIES UNION of WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
T: (206) 624-2184 / F: (206) 624-2190
lnowlin@aclu-wa.org

J. Denise Diskin, WSBA No. 41425
Beth Touschner, WSBA No. 41062
TELLER & ASSOCIATES, PLLC
1139 34th Avenue, Suite B
Seattle, Washington 98122
T: (206) 324-8969 / F: (206) 860-3172
denise@stellerlaw.com
beth@stellerlaw.com

Joshua A. Block*
Leslie Cooper*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, New York 10004
T: (212) 549-2627 / F: (212) 549-2650
jblock@aclu.org;
lcooper@aclu.org

** Motion for admission pro hac vice to follow*

***Attorneys for Plaintiffs***



AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 FIFTH AVE, SUITE 630
SEATTLE, WA 98164
T: (206) 624-2184